Good morning. May it please the court. My name is Rob Chaykin. I represent Wayne Klocke, who is the administrator of the estate of his deceased son, Thomas Klocke. This case comes to this court on a summary judgment record, and it has a pretty lengthy history. You've seen it four times, right? Yes, it manages to work its way up in one form or another here. The last time this case came up on appeal, it was also in a summary judgment context, and this court sent the case back down to Judge McBride. In the process, I think this court, a different panel, had admonished the district court to be careful about making impermissible credibility determinations, and really more or less directing them to give the record here its fair weight and to make inferences in the way that the summary judgment rules are structured, which is to give the nonmovement the benefit of the doubt here, among other things. There's no allegation that Judge McBride defied the mandate rule. He did do those proceedings. It's just whether he did them correctly, right? In the end, when the case, exactly. So the case came back down to Judge McBride. I would say that one of the comments that Judge McBride makes in his order is that he believes that Thomas has a motive to lie, and he doesn't make the same kind of credibility overlay with regard to Nicholas Watson's position in the case, and I think that's instructive and indicates, I think, the district court had some bias here or some motivation to port this case out. But I will agree that when the case went back down to Judge McBride, he did at least, at some cursory level, try to touch upon and go through some weighing of the evidence that is just done incorrectly, and he didn't give the appropriate credit to the overwhelming summary judgment evidence that will establish at least genuine issues of material fact on every material element in this case. Notably, is, you know, with regard to these defamation claims, Judge McBride concluded as a matter of law that Clockey had failed to present any evidence of any kind with regard to the falsity of the defamatory statements, and we believe the record is replete with evidence, genuine, competent evidence to show that that determination was just made in error. You need look no further than Watson's own admissions at some point in the case where he ends up admitting that he wasn't actually threatened. There's a witness named Blake Langford who was sitting next to these folks during the classroom encounter who saw no evidence of any kind of a threat or things of that nature. Indeed, Thomas Clockey himself reported to the investigating dean that he denied these claims and that he... Just to test that, that's what we're here to do, I'm delineating between the two statements. So we have the one to Snow and then we have the Facebook one. Correct. But in the Snow one, Clockey's only actual statements are that he felt, was it terribly scared and uncomfortable? I think that we're talking about Watson. Yeah, I'm sorry. Watson's statement there is that he felt scared and uncomfortable. What Watson said, I'm sorry. What I'm pushing at is he doesn't say in that statement that he felt any threat of bodily injury. So again, I think the reference that you're talking about, I think it's in page 10 of our brief and it was an email at one point. And I think what Watson reported was that he felt uncomfortable, didn't want to return to class. In that context, I believe the record was he said that he was scared to go back to class. And I think the circumstantial evidence from that is that he's afraid of a physical threat. I mean, it wasn't just that his feelings were hurt or that he didn't want to go back to class. He was literally scared. And I think that, so yes, I mean, I think at some level we're maybe talking about defamation by implication in terms of, as opposed to textual defamation that he doesn't say in there. Just what's your, to the extent you've got a best Texas case where it's defamation by implication, because right, that's, he reads it, his, his statement has been the gentleman displayed gay should die. And he says, I feel terribly scared and uncomfortable. That's the first alleged defamatory and that to say that that's false because he never said he was bodily injured or threatened for bodily injury. That's the leap I'm making. And I understand you're leaving. As I sit here right now, I know that we discussed some of the defamation by implication there, there are cases cited in our, in our brief. But I would also point out, and I think as, as your honor has pointed out there's also a contemporaneous Facebook post where Watson also says he was scared to go back to class and unless it was safe. I think actually was, was what the verbiage is. And so I think when you take some of those things together, obviously I think there's more than competent summary judgment evidence to raise a genuine issue of fact for the jury to decide indeed, there's other, there's other, you know, evidence as well. In this case the fact that, that just the, the, the evidence that Watson himself didn't really feel the need to, to run out of class or to, to, to seek help immediately, instantaneously, a jury could consider that. A jury can consider the fact that ultimately the UTA folks, at least Moore, had some doubts about, about the conclusion about whether or not Thomas Clocke ever did in fact, you know, say that he had threatened this boy. I would say again, I think there's a lot of time spent on the word threat and what it means with regard to whether or not that would be per se defamation or otherwise. I think if, with all due respect to opposing counsel, they, they spent almost three pages talking about the word threat and what it may or may not mean. I think the jury in a case like this should decide whether or not Watson's own reactions to it and his own beliefs that, that he, he indicated, number one, he said on Facebook that he was threatened and number two, the fact that he was scared and that he needed to feel like it was safe to return back to class. I think there's more than ample evidence. Where do you point in the record that just for this suggestion that Moore had doubts about the truthfulness of Watson? I think I have that site here. Moore, doesn't Moore call Thomas Clocke almost immediately and, and he doesn't reflect that Thomas then said, I deny it. I didn't write Gay Should Die. It's four days later. But I thought that Moore in the four day later interview very much doubted the deceased's reading. And I, and I, and I, with, I don't think that's in dispute. I believe the, the original, the original encounter, uh, Moore has doubts, uh, or expressive some doubts about Clocke's version, uh, or at least with regard to the credibility determinations that Moore was making. And he noted that, uh, Thomas Clocke, he was using some notes or a script or something like that later on. And I can find that record site again. I apologize. There, there is a point where Moore on deposition, you know, testified that ultimately, and I think there's an email to this effect. He says, I don't know that there's enough actually evidence really to keep this boy out of class, even after they'd already determined, uh, that that's exactly what the punishment was. And the punishment was actually for making a threat under the code of conduct. Um, so I, I do think that on the first element of, of falsity that the district court identified, I just think he just made a determination error. I think it was, is motivated by an outcome determinative, uh, process, but, um, and then, you know, getting into, um, some of the areas, some additional areas, which some of these are treated very quickly and in a cursory fashion by the district court. Uh, but I would like to at least address, um, the issue of the dead man's rule, um, which is essentially, and I think the differentiation here is, is that the opposing counsel is, is arguing that, that, you know, the dead man's rule shouldn't apply here because there's corroborating evidence and the corroborating evidence that they are pointing to are Watson's own self-serving statements that he put on Facebook, um, at the time to, to say, well, this, this must mean, um, you know, that, that there's, that, that this is reliable. The cases that discuss this and I, and I can look back at these cases, they're on the briefing, um, discuss the fact that corroboration that, that really the rule is talking about is, is independent, verifiable, reliable, uh, corroboration. It's usually another witness or, you know, reporting authority or something like that. I, I don't think. So the declarant can't corroborate themselves? I think the declarant really can't corroborate himself. What about Moore's notes, especially about the first phone call? Why isn't Moore's declaration that sufficient corroboration triggered the exception? It might be other than the fact that, that in the end Moore then, uh, subsequently, uh, reached a conclusion that he didn't think he had enough evidence to hold this boy out of class. So I, I don't know that there really is, uh, the corroboration, you know, necessary. Um, I would say that, that there's another argument moving on. If I answered, did I answer your question? Yeah, that's an important point though for me. Moore's, Moore did give a declaration here and he did talk to Tom's Clockie who didn't deny the statement according to his notes. Well, and I, I think that the, you know, I don't know that he, that he did or didn't necessarily deny it. What he really said is his, is his version of events was different, uh, and that he, that Clockie himself may have felt threatened or that he was the, he was the one being satanized. I thought, correct me if I'm wrong, four days later he says maybe there was a romantic overture and I was being imposed. I don't think there's, in his declaration, there's nothing to suggest that Moore, when he first called Clockie. I think that's correct. I think your, your, your version is correct. I'm, I'm looking at the interaction and the totality of the interaction, Your Honor. Um, and I would say with regard to the, um, to the dead man's rule, the second argument or the underlying, uh, inquiry was whether or not somehow, uh, it was waived because of the use of a deposition. And I think, um, you know, the, the Texas law was somewhat unsettled on that issue. Uh, and, and, uh, our prior panel was skeptical of that, correct? Yeah. And, and, and the thing about that is, is, is, is, is I think really what the rule is talking about is if you, if you're at trial and you decide to put somebody on and start to make, make hay with this, with their, their own testimony or something like that, that's a different matter. But I mean, I think the idea that you can't take a deposition or ask discovery questions to try to determine the truth or falsity of what's going on or what the interaction is, um, I, I think that would be a draconian rule, um, in that context. And so I think, um, Judge Oldham had kind of talked about that, I think, in, in, in, in his, um, you know, in his opinion about the fact that, that he felt like it made more sense in the context, if there was a waiver, uh, or a waiver argument, that it would occur in the context of, of an actual trial. Um, and so, you know, I, I don't think that, I, I think the district court misapplied the dead man's rule here. I would also say that, that with or without the application of the dead man's rule, I don't believe it's outcome determinative, uh, on whether or not this case should go to a jury anyhow. Um, it's just one more piece of evidence. And again, the jury is just going to be weighing, you know, all of this evidence and all, all of the credibility determinations that, that I think the district court impermissibly, uh, supplanted here. Um, there is, again, he, the district court, uh, brushed, uh, very quickly a discussion about whether or not there was any defamation per se, uh, and the, the cases there that, that we had discussed, talked about, there was an Anderson case and a Bentley case, and I think they, they do a very good job of explaining why this would be per se defamation. The district court seemed to seize upon, uh, I think the, the question you had earlier about, well, is this the kind of threat that would constitute, uh, an assault? Uh, and he just determined that it wasn't. Um, and he just made that determination. And so, um, you know, the, the per se defamation here, I think is really arises in this record in two contexts. One is, is that, uh, if there was a threat, it's implicit that there was an assault and And there was also an underlying sexual misconduct implication here, um, with regard to, to, you know, this homophobic slurs, um, and, and associated when you take the two in context, it clearly is the kind of thing that would, would hold, um, somebody's, uh, reputation just on its face, um, to ridicule, uh, and extreme mental anguish and things of that nature. In fact, in the end, um, that's precisely what happened here. I mean, this, this young man was excluded from class, uh, which is an injury. The fifth circuit had already recognized in and of itself was a discreet and concrete injury here. Um, but there was obviously this record was replete with more evidence than that. And I'll, I'll get to that in a moment, but maybe just quickly give me your best Texas case on defamation per se analogous to this, um, statement where the statement is, I felt scared by a state, by the person saying gay should die is there's no criminality or allegation of criminality in that, right? I, I, again, I think, I think the, the argument with regard to, to homophobic slurs or that gay should die, I think that goes in the, the basket of sexual misconduct or potential sexual misconduct. I think the threat, okay, at some point or the implicit threat is this Texas penal code for assault, um, and for physical violence and, and associated with Nicholas Watson's own comments that. Sorry, I asked you the question. So you're going to 40 seconds. Can you speak to the statute of limitations? Yes, I could. On the Facebook claim, um, uh, the issue with regard to when and how the Facebook claim could have been brought. Um, we cite a number of cases, both state and federal cases that talk about tolling of limitations where there's a pending legal, uh, dispute in this Texas, uh, the TCPA, the anti-slap statute was on appeal and the resolution of that question probably would have ended any defamation claims of any kind, um, that may have been able to been brought in this case. And so I think the, the, the tolling, uh, limitations to avoid judicial complication and really in practical sense, um, given where this case was at procedurally, um, you know, the, the argument that, well, we should have just filed a whole nother case somewhere else. Uh, I often wonder how Judge McBride would have reacted, uh, to that effort if we actually pursued that course. But I think the law is, is very clear on equitable tolling, uh, for a pending judicial matter here. Um, and I think that gets us, gets us there. If there's any other questions, I'm happy to address them. Thank you. I appreciate your time. May it please the court. This case is about statements that were made by one student to another in the middle of the class that were made by typing on a computer. I think it's easy to miss what those statements really were about in talking about these various rules. And I just want to start with setting the context of what we're actually talking about here. That interaction occurred and immediately after that interaction, Nicholas Watson reached out to his professor and wrote this. During the class, I participated in a class, I'm sorry, excuse me. He wrote. We know, we know everything you said to Long and to Snow. Well, it's very important. I think to remember, we're talking about what's his use of the word threatened, legitimate. He typed into his computer bar, his computer search bar, gays should die, and then proceeded to call me a faggot and that I should kill myself. I do not feel safe in the class at this time, given the threatening presence this student has provided. And then Long says, put it in writing and send it to Snow. Exactly. He went to Snow. He also, at the same time, reached out on Facebook to his Facebook friends and described what had happened, describing the exact same thing. And then when he went to Snow, he described the exact same thing. On his Facebook post, he said, I haven't felt this uncomfortable in a long time. He said he was scared and frightened. And the question in this case is whether or not his statements were defamatory. And more importantly, whether or not there's any... Can I just leave out, I mean, didn't the first one say aggressor, and then the second one he does use the word threat. That's correct. And I think those use of those words was truthful and accurate, particularly in the context in which they were made. In each time he described this incident, he didn't just use those words willy-nilly. He didn't use them without specifics. Rather, he specifically described the alleged statements that Thomas had made to him, and then used those words to describe his feelings about those statements. And there's no confusion about what he was talking about. In every single communication, his communication to his professor, his communications to his friends on Facebook, and his communications to Snow, he first describes Thomas's specific statements of calling, saying he should die, gays should die, calling him a faggot, and then telling him he should kill himself. And then he uses those words, I found it threatening, the student who threatened me, the aggressor in the class. It was very clear exactly what he was talking about. And in each time, he used those words to clearly communicate to different audiences, his professor, his friends on Facebook, and to the Title IX coordinator how he was feeling based on the statements made by Thomas. If our Court's remand was saying to Judge McBride, but there may have been another side to the narrative, and why isn't there a fact issue if the deceased came in and said, no, I didn't do any of that, he made an overture to me? Well, first, the remand actually was to Judge McBride, as I would say, you didn't do the two-to-one decision, did the analysis on all of the evidentiary issues, and affirmed summary judgment. And Judge Oldham issued his dubitante opinion, asking some questions, and then, upon reconsideration, the panel said, they didn't send it back and say, we find a fact issue, that is not what the prior panel did. They just said, make sure it's not a he said versus— Make sure you do your homework and don't engage in credibility determinations. Set forth your reasoning. There's a bunch of evidentiary issues that were identified, Judge McBride, but you didn't go through them and analyze each one. Opposing counsel today has said that on remand, Judge McBride was biased and he was cursory and he brushed this out. He poured it out. I disagree. Any discussion of the fact that Thomas may have had justification not to be truthful was in the context of an evidentiary ruling as to whether or not the statement that Thomas made to Moore, whether there should be an exception to that hearsay rule. Clearly it's hearsay. And the issue is whether there should be an exception. And one of the bases— We didn't explore that much. What do you think their primary hearsay exception argument is? Well, they raised three, and I'm happy to discuss each one. You think none have merit? Absolutely none have merit. No state of mind issue here? Well, the first is with present sentence impression under 803.1. It clearly does not qualify as a present sentence impression. Four days later. Four days later. It doesn't have the quality that would justify making an exception to the hearsay rule based on a present sentence expression. Now certainly if anybody issued their present sentence impression here, it was Watson who issued two statements right around the time that it occurred, not Thomas. The second is a business record. This is very clearly hearsay within hearsay of a business record offered by a third party, not the statement of the person creating the business record. That applies to both Moore's notes of the interview as well as Moore's summary of the interview and his decision. And finally, the residual exception to hearsay. This does not have the quality that would justify applying a residual exception. The case they cite is about an interview notes of a child that was taken by a trained investigator about sexual misconduct to that child. You seem right, I guess, at a broad 30,000 foot level, though there's some asymmetry, but you may say that's the way the law works. In other words, you're saying you get the dead man rule exception by virtue of primarily corroboration. So the deceased statements that are consistent with Watson come in, but they have a hearsay obstacle to keep out the deceased. I don't want any of the deceased, the deceased statement, the question is whether Watson's testimony about what occurred comes out. What he said to him. That's right. And let's talk about why that comes in. And so the Texas dead man's rule applies except unless there's two exceptions, right? Number one, there's other corroborating evidence, and that can be documents or testimony. Okay. What's the best corroboration that isn't from Watson himself? Well, the best corroboration would be Long, I mean, not Long, excuse me, Lankford. Lankford himself, they make it a point, let's talk about Lankford really quick. They argue that Lankford provides contrary testimony. Actually everything Lankford testifies is completely consistent with Watson's statements in this case. Because let's remember, what are they alleged to have occurred? It's alleged that Thomas, after Watson spoke, Watson sat down, Thomas turned his computer and started typing to Watson. Lankford's sitting over here. He can't see what's going on. He testifies he didn't see what's going on. I didn't see what was going on. I never saw what they typed into each other. But I could tell they were very tense, and then at some point Watson told him, well, I think you should leave. And that's completely consistent with Watson's testimony of the interaction. The interaction, other than that verbal statement, the interaction was on their computers. And then at the end of class, Lankford testifies that after class, Watson came up to him and said, this guy just did this to me. And Lankford doesn't recall exactly what Watson said, but he remembers that Watson said that and that Watson told him he should die or kill himself. That's what Lankford says about that, what Watson told him immediately after class. Lankford's testimony is completely consistent with Watson's versions of events. That's one outside corroboration. That's not corroborating. Do you rely on Moore's declaration is what I'm getting to? I do not, because I don't find that necessary. In addition, the other documents corroborate Watson's testimony. Now, there's a case that was cited where the statements about what the declarant said, I mean what the deceased said, were made in a single affidavit. And the declarant was trying to argue that the statements in my affidavit about both what he said and that I told that to someone else support the fact that the decedent said these things. And the court said, no, no, you can't use your own statements in the affidavit. You can't use your testimonies to support your testimony. But that's not what we have here. We have contemporaneous documentation of what occurred that supports Watson's testimony about what happened. We have Watson's statements at the time that occurred that are all completely consistent and are completely appropriate exceptions to the year of sale. I mean, completely appropriate corroborating evidence to justify an exception to the dead man's word. In addition, this— Do you have a Texas case about self-corroboration? Well, the only case they have that says you can't self-corroborate is about two statements in the same affidavit that they're relying upon. And there's lots of— I thought the case you tried on remand was more focused on corroboration than waiver. Fair to say? Or you think you did both? I would have to go—to be honest, Your Honor, I don't recall exactly. We certainly addressed both in our brief, and I think certainly both apply. And as to the second exception, Texas case law is clear that even after the amendment, Texas appellate courts have continued to say if you use—not only do you take discovery of the alleged statements, but also use them offensively for the purposes of establishing liability, such as at trial or in summary judgment, then you waive. Now, here, not only did plaintiff's counsel question my client, Watson, extensively about what Thomas Clockie said to him, they then relied on that same evidence in their own summary judgment brief to try to impose liability on my client. That's the waiver. And that is supported by Texas case law at the Texas appellate courts. Now, as Judge Oldham recognized in the prior opinion, the Texas Supreme Court has not ruled on this issue since the amendment to the rule—to the Deadman's Rule. However, Fifth Circuit case law is clear that when there's no Texas Supreme Court ruling, you look to the court of appeals rulings. And both courts of appeals rulings that have ruled on this issue support the continued application of waiver in the context of not only use of—or questioning in discovery, but use of that offensively to try to impose liability on the other party. That's the waiver. And that is exactly what occurred here when plaintiff's counsel not only deposed my client and asked him for eight hours questions about what occurred, and then used—tried to use his testimony to not only—not only defeat a summary judgment motion, but themselves move for summary judgment and impose liability on my client. In addition, they also went—despite saying that they did not intend to call my client at trial, issued a trial subpoena, which is in the record. Issued a trial subpoena to Nicholas Watson, saying they were going to call him at trial after reporting that they had no intention of doing so. I would like to make sure we get to the Facebook point and the waiver point. Unless the court has any other questions about the evidentiary issues. I want you to go right where you want to go, I guess. Do you—would you point us to a defamation per se case? So— You heard his suggestion that this case would qualify under Texas law for an allegation of sexual misconduct or criminality. Yes. So let's talk about defamation per se. The question is whether or not Watson's statement about that interaction accused Thomas Klotke of conduct so reprehensible that it causes defamation per se. And there is the phrase of sexual misconduct that's used in the definition of defamation per se, and then that's very clear, all the cases that talk about that are about sexual crimes. And accusing people of child pornography, incest, those types of conduct, right, that clearly are reprehensible and criminal conduct. That is not what occurred here. Now, I do not have a case that says accusing someone of using a gay slur is not defamation per se. I don't have a case that says that because no one's ever tried to assert that, as far as I can tell, until this case. But what is clear is that defamation per se does not reach every suggestion that—of a slur or a gay slur. Rather, it is very specific to statements that impute someone's professional credibility, which is not the case here, or accuse someone of sexual misconduct to the level of criminal sexual misconduct, rape, those types of things. That is not what happened here. Let's go to the Facebook—the timeliness of the Facebook claims. This case arose—I think it's important to understand the context in which the case arose. This case arose first. There was a Rule 202 deposition of both the investigator in this case, Mr. Moore, and the Title IX coordinator, Ms. Snow, at UT Arlington. After that, that's when the plaintiffs identified my client, Mr. Watson, as the student who made the—brought forth these matters to the university. They then—they had his email to Ms. Snow, the Title IX coordinator, and then they brought suit against both UT Arlington and my client, Mr. Watson, for defamation. We filed an anti-slap motion. That was granted by the district court. That went up, and the district court separated the two parties and issued a final judgment as to Nicholas Watson that allowed the appeal of that to go without it being an inlocutory appeal. So while the appeal of the anti-slap motion was pending, the claim against UT Arlington continued to proceed through discovery. And during that discovery, plaintiffs deposed my client. And in that deposition, as part of that deposition, they issued a document subpoena, and in response to that document subpoena, we provided the Facebook post. And that's when they learned of the Facebook post. That was in February of 2018. The case against UT Arlington was still being—was still ongoing, and that—it was still pending, and also the appeal of the anti-slap motion was pending at the same time. They could have brought a claim. They could have easily brought a claim. They did not. They chose to sit on those Facebook posts for a year and a half. And then once the case was—the anti-slap motion was decided, went back down to the district court, that's when they amended their petition. Now, they say we were precluded from amending our petition by the pendency of the appeal on the other matter. Now, Texas courts are very clear that defamations based on different publications are different transactions. Subject to different—they are not the same transaction or occurrence for purposes of the pleading rules or purposes of the statute of limitations rules. TVV Azteca makes that very, very clear, TV Azteca case from the Supreme Court. And so then the only question becomes, was there a justification for tolling the limitations for the plaintiff's failure to file their claim in this case? I would point the court to Newby v. Exxon, a case that we both cite in our brief and a case for—actually, I'll give it—I'll be transparent for a different proposition. But we also cite a case called Deutsche Bank. And in Deutsche Bank, our citation of that says, Listing cases rejecting the pending legal doctrine applied to other circumstances. And if you go to Deutsche Bank, it lists this Newby v. Exxon case. In Newby v. Exxon, there was actually an injunction precluding the party from making any further claims in the case while the injunction was in effect. And on appeal, the party said, well, the reason we didn't bring—amend our complainer, try to bring these additional claims that you say are now time-barred is because we were under this injunction. And the Fifth Circuit said, that's not good enough. An injunction wasn't good enough. You didn't do anything to try to seek leave from the injunction. You didn't go to the district court and say, dear district court, can we have leave from your injunction to amend our pleading to bring this what would otherwise be a time-barred claim. There was not even a—there was no injunction here. There was nothing precluding the plaintiff here from bringing a separate lawsuit. Because remember, these are different publications which are not subject to the pleading rules under Texas law, and therefore could easily have been brought in a separate lawsuit, either in federal court or state court. Nor did the plaintiffs ever go to the district court. They never went to Judge McBride requesting leave to file an amended petition for the purposes of preserving their statute of limitations. Nor did they ever come to us asking for a tolling agreement based on these new claims that they now discovered in February of 2018. They did nothing other than wait. They waited for a year and a half, and during that—and then at the end of that year and a half, they tried to assert these new claims. That is nothing like the cases they cite and rely on to argue for equitable tolling. In those cases they cite for equitable tolling, the parties named the—filed petitions naming the defendants as does. They did all sorts of discovery to try to find them. They attempted service, which was unsuccessful. They did—they were doing—the parties in the cases they cite for equitable tolling made all sorts of efforts to preserve their claim during the relevant period, such that there was a justification for allowing them to toll those claims equitably once they were able to bring the claims. That is nothing like the case here. And none of the facts justifying equitable tolling apply here, such that the plaintiff's Facebook claims should be completely time-barred. And with that, there is no use of the word threatened anywhere in an alleged defamatory statement. Now, plaintiffs made a lot—to go back to the threatened issue, plaintiffs' counsel argued that we spent a lot of time on that in our brief. Well, the reason for that is, is because that's the base—the plaintiffs spent a lot of time on that issue once this case was remanded. That issue was not the focus of the case when it was initially up on summary judgment, but after the—in my opinion, after the prior panel issued all the ruling—all the evidentiary rulings in favor—in our favor, and then said, well, well, well, maybe we went too far. We should let Judge McBride do this in the first instance. We shouldn't do it, and sent it back to Judge McBride. Plaintiffs then shifted and realized, oh, we're going to have to create a different factual issue. And now the new factual issue is this word threatened, and that was declared somehow defamatory because he used the word threatened. Well, I've explained how his use of the word threatened was completely consistent. I want to be respectful to the Court. Thank you for your time, and we would request the Court affirm the district court's summary judgment ruling. Thank you very much. I think I have five minutes. Just very quickly, I want to try to address some of the prior questions and what counsel has just indicated. First of all, on page 30 of our brief, we discuss the different kinds of defamation, and it addresses—you had asked a question about defamation by implication. That is the wing case on page 30 of our brief. There's also—you can have negligence. In fact, the Fifth Circuit's opinion, the prior opinion, actually discusses the negligent aspect, the failure to act prudently with regard to what you say and how you say it in terms of a private person. That case is the Scripps case, if you're looking for a case, Your Honor. And as well, you can have extrinsic defamation as opposed to textual. Textual is obviously the exact written word, and then extrinsic is looking at the surrounding circumstances. So I think all of those cases, we discuss the different kinds of defamation, and they're all present here. You asked me a question, I believe, about what I thought maybe was the best per se defamation claim. I would say it's probably the Bentley case, the judge, the case of the state court judge. And I think that case actually talks about per se defamation, talks about other kinds of defamation, and actually goes on to discuss about direct and circumstantial evidence that can be utilized as proof, and competent proof for a case of defamation. I think we have all of those going on here, but it is, you know, they are all set out in the brief, and the cases there discuss the different kinds of defamation. And so I think that is important. The Facebook tolling question is, again, the cases that we cited, there's a Castillo case and a Manpower case. It's on page 39 of our brief. And the fact of the matter is it was a separate pending judicial matter. The outcome of that determination would have precluded any further litigation. So I think in the context of direct tolling and equitable tolling, they both apply here. I agree this is not a John Doe question. In fact, to find a case exactly like this was difficult with regard to the tolling. But make no mistake, the Facebook allegations are important, both as they serve as a basis for a totally independent claim that was timely brought with regard to the amendment or should be brought subject to the equitable tolling. But it is important, I think, to close with this, which is that evidence is still going to be utilized and would still be admissible in this case in terms of corroboration of what actually did or didn't happen and what Nicholas Watson did or didn't say. And I think it's fair to look at that on page 10. We quote what he says in that Facebook allegation. He says the student that threatened me today has been removed from the course pending investigation and the school is taking preventative measures to assure my safe return to class in the morning. And I think that's the point here. This was not mincing, not I felt maybe threatened or anything else. He specifically decided, this young man, to go out in a separate environment beyond what he reported, okay, just to the school authorities and claim that he was threatened and that he was scared and needed assurances so he could safely return to class. I think a reasonable jury could easily conclude by implication and extrinsic evidence and circumstantial evidence and direct evidence in this case that that amounts to a defamation of character in this case. And with that, I'll give you back some time, and thank you. Thank you.